IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| SHAWN MICHAEL MEECH, | ) | CASE NO. 1:12CV2134 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, [1] | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Shawn Michael Meech ("Plaintiff" or "Meech") seeks judicial review of the

final decision of Defendant Commissioner of Social Security ("Commissioner") denying his

application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act

(the "Act"), 42 U.S.C. § 1381 *et seq.*  Doc. 1.  This matter has been referred to the undersigned

Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2(b)(1).  As set

forth below, the Administrative Law Judge ("ALJ") erred at Step Three of the sequential analysis

because he failed to evaluate properly whether Meech's physical impairments met or equaled a

Listing.[2]  For this reason, the final decision of the Commissioner should be **REVERSED** and

**REMANDED.**

## I.  Procedural History

On September 29, 2009, Meech filed an application for SSI, alleging a disability onset

date of December 31, 2001.  Tr. 116.  Meech claimed that he was disabled due to a combination

of impairments, including knee infections, surgeries on his knee, hallucinations, anxiety, and

---

[1] Carolyn W. Colvin became Acting Commissioner of Social Security on February 14, 2013.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, she is hereby substituted for Michael J. Astrue as the Defendant in this case.

[2] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

mood swings.  Tr. 40, 73-79, 144.  His claim was denied initially and on reconsideration.  Tr. 63-69, 73-79, 80-81.  On February 7, 2011, Meech appeared and testified at an administrative hearing before an ALJ.  Tr. 37-58.  On March 8, 2011, the ALJ issued a decision finding that Meech was not disabled.  Tr. 18-36.  Meech requested review of the ALJ's decision by the Appeals Council on March 29, 2011.  Tr. 17.  On June 15, 2012, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-5.

## II.  Evidence

### A.    Background

Meech was born on May 18, 1975, and was 34 years old on the date that he filed his SSI application.  Tr. 29.  He completed high school.  Tr. 149, 205.  After being released from prison in September 2009, Meech resided with his family.  Tr. 116-17, 154.  Meech worked previously as a general laborer for a temporary agency.  Tr. 47, 52, 145.  He reported that he stopped working on January 31, 2007.  Tr. 144.

### B.    Medical Evidence

#### 1.    Mental Impairments

##### a.    Treatment History

On September 21, 2009, Meech underwent a diagnostic assessment at Pathways, Inc. ("Pathways").  Tr. 223-32.  He reported that he was anti-social and nervous, had difficulty showing up to work, had difficulty concentrating, had paranoia, had sleeplessness, and mood swings.  Tr. 226.  He reported that he did well in jobs when he used drugs.  Tr. 224.  Meech reported no substance abuse within the prior twelve months.  Tr. 225.  He reported having auditory hallucinations in the past. Tr. 225-26.  Meech was advised to, and agreed to seek individual counseling to obtain coping skills as he adjusted to the community after his recent

2

release from prison on September 18, 2009.  Tr. 227.

Meech had a psychiatric evaluation at Pathways on October 5, 2009.  Tr. 236-38.  He presented with an unkempt appearance, anxious mood, constricted affect, and impaired attention/concentration. Tr. 237-38.  He stated that he was previously treated for social anxiety disorder, and reported feeling anxious and alarmed.  Tr. 236.  No delusions or hallucinations were reported.  Tr. 237-38.  The evaluator diagnosed Meech with generalized anxiety disorder and bipolar disorder and categorized him as "markedly ill."  Tr. 238.

Meech saw Wendy Young, PA-C, at Pathways on October 20, 2009, and indicated that he was "doing well."  Tr. 244-45.  He complained of anxiety, mood swings and difficulty sleeping.  Tr. 244-45.  Ms. Young indicated that Meech exhibited slight improvement in temperament and was moderately ill.  Tr. 244-45.  Meech had a follow-up appointment with Ms. Young on November 3, 2009, and reported increased anxiety and stress, but denied mood swings and stated that Depakote helped.  Tr. 242.  He reported being sober since April 9, 2008.  Tr. 242.  He also reported that he wanted to get a job.  Tr. 242.  On November 17, 2009, Meech saw Ms. Young and complained of increased anxiety and stress.  Tr. 240-41.  Ms. Young noted that Meech had good energy and appetite, and that he was only "mildly ill."  Tr. 240-41.  At a session at Pathways with Ms. Young on January 12, 2010, Meech reported that his sleep and energy had improved and that he was "doing well." Tr. 273-74.  Ms. Young again noted that he was "mildly ill."  Tr. 274.  On April 13, 2010, Meech saw Ms. Young and stated that the "last couple months have been rough."  Tr. 292.  He reported that he had been working as a landscaper and painter and that he wanted to work full time.  Tr. 292.  Ms. Young again noted that Meech was only "mildly ill."  Tr. 293.

On July 27, 2010, Meech saw Thinagrara Jayakumar, M.D., at Pathways for a psychiatric evaluation following a hospitalization for, among other things, Methicillin-Resistant Staphylococcus Aureus ("MRSA").  Tr. 406-407.  Meech reported that the current dosages of his psychiatric medications were not controlling his symptoms.  Tr. 406.  Dr. Jayakumar identified Meech as "markedly ill" and reported no change in his diagnoses.  Tr. 407.  Dr. Jayakumar increased Meech's medications.  Meech had a follow-up appointment with Dennis Ugboma, M.D., at Pathways on September 7, 2010.  Tr. 487-88.  Meech reported continuing anxiety and depression, as well as chronic pain.  Tr. 487-88.  Dr. Ugboma increased Meech's dosage of Cymbalta.  On November 8, 2010, Meech saw Praveed Abraham, M.D., at Pathways, and complained of mood swings, pacing, and restlessness.  Tr. 567-68.  His medications were again adjusted. Tr. 568.

### b.    State Agency Physicians

On December 23, 2009, Paul G. Josell, Psy. D., a licensed psychologist, examined Meech.  Tr. 252-53.  Meech reported being clean and sober for the prior one and a half years, with much of that time spent in prison.  Tr. 252.  Meech reported that he read the newspaper and books, watched television, cleaned, fixed things around the house, and did laundry daily.  Tr. 251.  He stated that he also spent time visiting a friend and playing video games.  Tr. 251.  Upon examination, Dr. Josell found that Meech was alert; did not appear overly anxious or depressed during the interview, other than his self-description of such problems; and exhibited appropriate affect.  Tr. 252.  Dr. Josell diagnosed Meech with bipolar disorder, social phobia, antisocial personality disorder, alcohol dependence (sustained full remission), cannabis dependence (sustained full remission), cocaine dependence (sustained full remission), and opioid dependence (sustained full remission).  Tr. 253.  He opined that Meech had the following limitations: (1) no

4

impairment in Meech's ability to understand and follow directions; (2) moderate impairment in Meech's ability to relate to others, with capacity to work in a setting that involved interaction with others; (3) moderate impairment in Meech's ability to maintain attention, concentration, persistence, and pace to perform routine tasks; and (4) moderate impairment in Meech's ability to withstanding the stress and pressures associated with day to day work. Tr. 253.

On January 11, 2010, Frank Orosz, Ph.D., a state agency psychologist, reviewed the medical evidence and completed a Psychiatric Review Technique form and Mental Residual Functional Capacity Assessment form.  Tr. 255-72.  Dr. Orosz adopted Dr. Josell's functional findings and noted that Meech's substance abuse was in full remission.  Tr. 257, 267.  He concluded that Meech was capable of sustaining employment in a work environment without strict production quotas and minimal public interaction.  Tr. 257.

### 2.     Physical Impairments

#### a.     Treatment History

On June 15, 2010, Meech presented to Lake West Urgent Care ("Lake West") with lower back, right side, and right knee pain after falling off a ladder.  Tr. 303-05.  Diagnostic imaging showed no fractures to the spine or knee.  Tr. 307-08.  He was diagnosed with a right knee sprain/strain and was prescribed Vicodin.  Tr. 306-08, 313.  After continuing to experience pain in his knee and developing an abscess on his right cheek, Meech presented to Lake West a second time on June 19, 2010 and was admitted to Lake West until June 30, 2010.  Tr. 349-52. Upon admission, he was diagnosed with right facial cellulitis, and possible right knee septic arthritis, as well cellulitis of the proximal tibial region of the right leg.  Tr. 350, 352.  During this hospitalization, it was noted that Meech exhibited worsening pain, redness, and knee swelling.  Tr. 369.  He also reported that he last used IV heroin on June 18, 2010, the day prior to

his admission.  Tr. 354.

While at Lake West, diagnostic medical tests revealed that Meech had bacterial infections in his chest, cheek and knee, positive drug tests, and MRSA and pulmonary emboli.  He was treated with intravenous ("IV") antibiotics and Coumadin.  Tr. 315-16, 329, 331-32, 341, 364, 383-84, 387-91.  On June 21, 2010, Meech underwent a right knee arthroscopy, articular cartilage shaving, copious antibiotic irrigation, and insertion of a Hemovac drain.  Tr. 315-16.  Meech also had the abscess on his cheek drained.  Tr. 341.  His recovery from these procedures was complicated by a septic pulmonary embolism with deep vein thrombosis in his lower extremities.  Tr. 364-65.  During his final days of hospitalization, Meech was sleeping and resting well, complained of pain of 3/10, and was in no apparent distress.  Tr. 342.  He was discharged from Lake West on June 30, 2010, at which time he was transferred to Altercare of Mentor Center for Rehabilitation ("Altercare"), a nursing home, for continued treatment and rehabilitation.  Tr. 365.

Meech began physical and occupational therapy at Altercare under the care of John Baniewicz, M.D., on July 1, 2010.  Tr. 394-96.  He reported pain (9 out of 10), decreased balance, decreased mobility, impaired problem solving skills, impaired ability to follow directions, limited range of motion, and decreased sensation in his right foot.  Tr. 394-96.  On July 7, 2010, Meech continued to experience strength, balance, and gait deficits.  Tr. 400.  However, by July 30, 2010, it was noted that Meech no longer needed physical therapy and was able to ambulate independently with a walker.  Tr. 409.  He was therefore discharged from Altercare. Tr. 409.

From August 2010 through February 2011, Meech's pulmonary emboli continued and he took Coumadin to address them.  Tr. 654-700.  By January 2011, treatment noted indicated that

6

Coumadin was effective in controlling Meech's pulmonary emboli.  Tr. 665, 667.

On August 9, 2010, Meech began treating with Dean C. Pahr, D.O., for management of his pain.  Tr. 485.  Dr. Pahr noted that Meech was in no acute distress and that his right leg was very swollen.  Tr. 485.  He diagnosed Meech with osteoarthritis of the knee, myalgia, and cellulitis of the leg.  Tr. 486.  Dr. Pahr recommended that Meech follow through with infection and orthopedic care.  Tr. 485-86.  On September 16, 2010, Meech returned to Dr. Pahr, who noted that he was doing very well, and was in no acute distress.  Tr. 504.  Meech reported that his pain, which was previously a 4 to 7 out of 10, was only a 1 of 10 at this visit.  Tr. 505.  Dr. Pahr noted that the combination of methadone and Voltaren gel significantly helped Meech.  Tr. 504-05.  He recommended that Meech continue taking his prescribed medications, including methadone, and continue with his infectious disease and surgical care.  Tr. 504.  At an appointment on December 7, 2010, Dr. Pahr stated that Meech was doing well, was in no acute distress, and was making progress with his pain complaints.  Tr. 560.  He assessed Meech with cellulitis of the leg, chronic pain syndrome, and knee joint pain.  Tr. 560.

Meanwhile, on November 11, 2010, Plaintiff saw Razieh Mohseni, M.D., at Lake Health and complained of increased pain, swelling, and redness of the right leg for the previous two weeks.  Tr. 509-10.  Dr. Mohseni noted that Meech appeared well and was in no acute distress.  Tr. 509.  Dr. Mohseni diagnosed cellulitis and referred Meech to the Lake West Emergency Department for admission and treatment because Meech's recent MRSA infection led to a high risk of deep vein thrombosis.  Tr. 509. Upon admission at Lake West, Meech was noted as being in no acute distress, with normal joints and gait, despite his complaints of three days of constant pain and swelling in his right knee.  Tr. 511-15, 518.  His deep tendon reflexes were intact, his pulse was within normal limits, and there was no distal extremity pain.  Tr. 519.  Meech was

7

ordered to have antibiotic treatment, and underwent incision and drainage of the right proximal tibia.  Tr. 520, 556.  Diagnostic tests revealed no evidence of deep vein thrombosis.  Tr. 536-42.  Bone biopsy results indicated acute and chronic MRSA osteomyelitis of the right tibia.  Tr. 536-42.  Meech was discharged on November 22, 2010 to complete antibiotic treatment as an outpatient.  Tr. 556-57.

On December 1, 2010, during a follow-up visit to Olusegun Ogunlesi, M.D., Meech reported that he was tolerating his antibiotics with no side effects.  Tr. 572.  During a December 15, 2010 visit, he reported right leg pain and swelling.  Tr. 570.  Dr. Ogunlesi noted that Meech was in no acute distress, had a healing right leg ulcer, MSRA right tibia osteomyelitis, and right leg swelling.  Tr. 570.  He recommended that Meech continue the antibiotic treatment.  Tr. 571.

Meech reported to the Tri Point Medical Center Emergency Department on December 15, 2010, with complaints of worsening pain and swelling in his right leg.  Tr. 585.  He was admitted for treatment and underwent an ultrasound and CT scan of his right leg.  Tr. 606-07.  The CT scan revealed an osteotomy of the proximal shaft of the tibia below the tibial plateau, a wide opening on the cortex of the osteotomy, and a sclerotic change around the cavity corresponding to the site of the osteomyelitis in the tibia.  Tr. 606-07.  The vascular ultrasound of the right lower extremity showed no evidence of deep vein thrombosis.  Tr. 608.  Treatment notes also indicated good sensation and that his upper and lower extremities were within functional limits.  Tr. 602.  Additionally, Meech's lower right extremity showed gross motor strength of 4/5.  Tr. 602.  His sitting support and static standing were normal and his gait and his ability to sit at the edge of bed was good.  Tr. 602.  Meech was discharged on December 18, 2010.  Tr. 602.  He was to continue his antibiotic treatment.  Tr. 602-03.

January 26, 2011, Meech presented to the Lake West Emergency Department with complaints of pain in his right leg and was discharged to his home the same day.  Tr. 636, 642. Treatment notes indicated that he was in no acute distress and was functionally capable of performing activities of daily living.  Tr. 639.  Results from a CT scan of Meech's right knee showed no evidence of worsening condition and no change from the prior CT scan.  Tr. 651.

At an appointment on with Dr. Ogunlesi on February 2, 2011, Meech reported improvement in his symptoms, with less pain, swelling, and redness in his right leg.  Tr. 631. Dr. Ogunlesi noted that Meech had completed a course of antibiotics for right tibial osteomyelitis and that he was in no acute distress. Tr. 631.

### b.        Disability Pain Questionnaire Completed by Dr. Pahr

On January 21, 2011, Dr. Pahr completed a disability questionnaire.  Tr. 618-19.  Dr. Pahr listed Meech's physical impairments as knee pain and cellulitis.  Tr. 618.  He stated that Meech's subjective complaint was chronic leg pain, which he experienced often enough to interfere with attention and concentration.  Tr. 618.  Dr. Pahr indicated that Meech's pain affected his ability to perform basic work-related activities, with no further statement or explanation of Meech's functional limitations.  Tr. 618.

## C.    Administrative Hearing

### 1.      Meech's Testimony

On February 27, 2011, Meech appeared with counsel and testified at a hearing before the ALJ. Tr. 43-52.  He stated that the last time he worked for money was in 2008.  Tr. 44.  He explained that he was unable to work on a full time basis because he has a real problem with anxiety and being around people.  Tr. 44.  Meech testified that the medications he was taking at that time – Cymbalta, Depakote, Ativan, and methadone – helped considerably but caused side

effects, including dizziness, tiredness, forgetfulness, and not being able to stand for long.  Tr. 44-46.  Meech also stated that the effects of his bipolar disorder improved with an increased dosage of medication.  Tr. 45.  He stated that his anxiety caused him to socialize only with his family and that he did not like to be around people.  Tr. 46.  He also stated that he experienced depressive periods where he struggles to get out of bed for six or seven days.  Tr. 45.  Meech testified that he still has his bipolar symptoms when he is not using substances and that his depression worsened after he stopped using, but confirmed that he that was happier and less depressed when he was not abusing substances.  Tr. 47.

Concerning his physical ailments, Meech testified that he experienced bilateral arthritis pain and soreness in his knees prior to May 2010 and that he contracted a recurring staph infection in his right knee in May 2010.  He stated that he had surgery to clean out the infection and that he was in a nursing home for 40 days on intravenous antibiotics after the surgery.  Tr. 48.  Meech testified that the infection returned and he had to have a second surgery on his right knee and undergo a second round of antibiotic treatment, which he discontinued on January 4, 2011.  Tr. 48.  Meech explained that, as of the date of the hearing (February 27, 2011), his right knee was again infected and he had resumed taking antibiotics.  Tr. 48.  Meech testified that he used a cane due to the snow and the weather, as well as to get around at home because he had fallen a couple of times.  Tr. 48.  He stated that he could walk about 100 yards before his knee began to hurt.  Tr. 49.  He described feeling less pain as the day progressed and as a result of taking his pain medication.  Tr. 49.  Meech testified that he could kneel on one knee but could not put any pressure on his right knee.  Tr. 50.  He said that he could not crawl or climb a ladder but that he could twist his body from side to side while standing.  Tr. 50-51.

### 2. Vocational Expert's Testimony

A vocational expert (the "VE") appeared and testified at the hearing.  Tr. 52- 57.  He stated that Meech had previously worked as a general laborer, which he classified as unskilled and at a medium exertional level.  Tr. 52.  The ALJ then asked the VE whether a hypothetical individual with Meech's vocational characteristics and the following limitations could perform any of his past relevant work:

> The individual presents with ability to do some medium work with exceptions. He can't work at unprotected heights and should not be assigned to operate foot controls and could only frequently [sic] be required to walk on uneven ground as part of the job.

> He cannot do ladder work.  Otherwise he would need a sit stand option being able to work in a seated position with few restrictions for at least six to eight hours in a typical workday if allotted the normal breaks.  And he could work on the [sic] feet, standing or walking short distances, for about six hours of a typical workday but not all at once.

> If given some type of sit stand option he could meet the requirements of, you know, being on the feet for the six hours as long as he could complete the workday in a seated position for the remaining two.  And . . . he can't do work that has rapid production requirements, fast paced production work, that that [sic] would not be something he could keep up with.

> Moving on to behavioral health the worker needs a work environment with minimal interaction with the general public.  And he would not be a person who could do independent work requiring sophisticated judgments.  Stated another way he needs a rather set routine to follow and the benefit of some supervision as opposed to setting his own schedule . . . .

> And he cannot easily or quickly adapt to significant changes in the work routine. To complete this you should know that the individual can do perfunctory social interaction, can adapt to simple changes and if the rest of this is met he could attend the basic work activities in a full day.

Tr. 52-54.  The VE responded that the hypothetical person could not perform Meech's past relevant work but could perform other jobs that existed in significant numbers in the national economy, including laundry laborer (300 jobs locally, 3,000 jobs in Ohio, and 50,000 jobs

nationally), housekeeping cleaner (2,000 jobs locally, 30,000 jobs in Ohio, and 500,000 jobs nationally), and mail clerk (900 jobs locally, 6,000 jobs in Ohio, and 200,000 jobs nationally). Tr. 54-55.  The VE further testified that use of a cane would exclude all of these jobs.  Tr. 57. Similarly, the VE stated that, if the hypothetical person were required to miss three or more days of work per month due to his impairments, it would preclude all work.   Tr. 57.

### III.  Standard for Disability

A.        **Standard Five-Step Process**

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).   In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,

claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920 (b)-(g); *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987). Under this analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform work available in the national economy. *Id.*

**B.      Regulatory Requirements when Alcoholism or Drug Abuse is at Issue**

In the Contract with America Act of 1996 ("Welfare Reform Act"), Pub.L.No. 104–121, 110 Stat. 847, 852-53 (1996), codified at 42 U.S.C. §§ 423(d)(2)(C) and 1382c(a)(3)(J), Congress amended the Social Security Act to prohibit the award of benefits to individuals for whom alcoholism or drug addiction is a contributing factor material to their disability determination. 42 U.S.C. §§ 423(d)(2)(C), 1382c(a)(3)(J). The statute provides, in relevant part:

An individual shall not be considered to be disabled . . . if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled.

42 U.S.C. §§ 423(d)(2)(C). Under the statute and implementing regulation, the key factor in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether the individual would be disabled if he or she stopped using drugs or alcohol. 20 C.F.R. § 416.935(b)(1). In order to determine whether a claimant's alcohol

or drug use precludes them from receiving benefits, the ALJ must first determine whether a claimant is disabled when the claimant's substance abuse is taken into account. 20 C.F.R. § 404.1535(a). Then, the ALJ must determine whether alcohol or drug use is a material contributor to the determination of disability, i.e., whether severe enough limitations would remain in the absence of alcoholism or drug addiction. *Id.* A determination that the remaining limitations would not be disabling will result in a finding that drug addiction or alcoholism is a "contributing factor material to the determination of disability." 20 C.F.R. § 416.935(b)(2)(i). Conversely, a determination that the remaining limitations are disabling will result in a finding that the claimant is disabled independent of his drug addiction or alcoholism and, therefore, that drug addiction or alcoholism "is not a contributing factor material to the determination of disability." 20 C.F.R. § 416.935(b)(2)(ii).

In order to make the required determinations, the ALJ must first complete an initial five-step analysis and determine whether the claimant is disabled with substance abuse. *Underwood v. Comm'r of Social Sec.*, Case No. 08-2540, 2010 WL 424970 at *6, * 10 (N.D. Ohio Jan. 22, 2010). If the answer is affirmative, the ALJ must conduct a second five-step analysis in order to determine if the claimant would still be disabled without the substance abuse. *Id.*

## IV. The ALJ's Decision

In his June 2010 decision, the ALJ correctly outlined the relevant standard of review for a claimant with impairments caused by, or connected to, alcoholism or drug abuse. Tr. 22-23. At Step One of the sequential analysis, the ALJ determined that Meech had not engaged in substantial gainful activity since the date on which he filed his application for SSI. Tr. 23. At Step Two, he found that Meech had the following severe impairments: bipolar disorder, anxiety, arthritis, myalgia, cellulitis, and drug and/or alcohol addiction. Tr. 23. The ALJ also found that

Meech's "medical condition concerning his tibia is more than minimal limitation [sic] the ability to perform basic work activities."  Tr. 24.  At Step Three, the ALJ found that, while using drugs, Meech's depressive disorder and his anxiety met Listings 12.04 and 12.09 of 20 CFR Subpart 404, Subpart P, Appendix 1.  Tr.  24-25.

Under the second part of the analysis for when substance abuse is at issue, the ALJ found that, if Meech stopped his substance abuse, his remaining impairments, although severe, would not meet or equal the any Listed Impairment under Step Three.  Tr. 25-26.  The ALJ then determined Meech's RFC and found that, if he stopped substance use, he could perform medium work with the following limitations:

> [N]o unprotected heights, no foot controls, no ladder work, may only frequently walk on uneven ground, he requires a sit/stand option with the ability to sit up to six to eight hours of an eight hour workday, and have a [sic] stand or walk short distances option during the first six hours of an eight hour workday if able to sit the last two hours and if he is not standing or walking constantly, he is unable to perform rapid production requirements, is limited to minimal interactions with the general public, he cannot perform independent work with sophisticated judgments, he requires some supervision, he cannot set his own schedule, he cannot easily adapt to significant changes in the work setting or work routine but can engage in perfunctory social interactions and adapt to simple changes, and attend to basic work activities in a full day.

Tr. 27.  Under Step Four, the ALJ found that Meech had no past relevant work.  Tr. 29.  Under Step Five, the ALJ concluded that, if Meech stopped his substance abuse, he was capable of performing work that existed in significant numbers in the national economy.  Tr. 29.  Thus, the ALJ concluded that, because Meech would not be disabled if he stopped his substance use, the substance use disorder was a contributing factor material to the determination of disability and, as a result, Meech was not disabled within the meaning of the Social Security Act.  Tr. 30.

## V.  Arguments of the Parties

Meech objects to the ALJ's decision on three grounds.  First, he argues that the ALJ erred

by ignoring his physical impairments at Step Three of the sequential evaluation. Second, Meech asserts that the ALJ erred by not including his deep vein thrombosis, pulmonary emboli, and chronic MRSA as severe impairments under Step Two and in failing to include additional limitations in the RFC to account for these impairments. Third, Meech contends that the ALJ erred because his findings regarding Meech's level of functioning in the absence of substance use were speculative.

In reply, the Commissioner contends that substantial evidence supports the Commissioner's Step Three determination. The Commissioner also argues that substantial evidence supports the ALJ's Step Two and RFC findings. The Commissioner further argues that the ALJ appropriately evaluated Meech's level of functioning in the absence of substance abuse.

## VI. Law & Analysis

### A. Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc.*

*Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**B.**     **The ALJ's Step Three Decision is Not Supported by Substantial Evidence**

Meech argues that the ALJ did not properly evaluate whether Meech's physical impairments met or equaled a Listed Impairment under Step Three of the sequential analysis. Doc. 14, p. 12.  Specifically, he contends that remand is appropriate because the ALJ failed to consider whether Meech's physical impairments met or equaled Listing 1.02.  The undersigned agrees that the ALJ committed error in his Step Three determination.

At Step Three of the disability evaluation process, a claimant will be found disabled if he has an impairment or combination of impairments that meets or medically equals one of the Listings in the Listing of Impairments. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Turner v. Comm'r of Soc. Sec.,* 381 Fed. Appx. 488, 491 (6th Cir. 2010).  Each Listing specifies the objective medical and other findings needed to satisfy the criteria of that Listing.  20 C.F.R. § 404.1525(c)(3), 416.925(c)(3).  A claimant must satisfy all of the criteria to "meet" the Listing. *Id.*; *Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 652 (6th Cir. 2009).  However, a claimant also will be found disabled if his impairment is determined to "medically equal*"* a Listing, 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Turner,* 381 Fed. Appx. at 488, which means it is "at least equal in severity and duration to the criteria of any listed impairment."  20 C.F.R. § 416.926(a); 20 C.F.R. § 404.1526(a).

Meech argues that his physical impairments meet or equal all of the required criteria under Listing 1.02A.  Listing 1.02 describes major dysfunction of a joint due to any cause and provides, in pertinent part:

**Major dysfunction of a joint(s) (due to any cause)**: Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:

A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b; or . . . .

Listing 1.02(A). The "inability to ambulate effectively" is defined as follows:

(1) *Definition*. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities . . . .

(2) *To ambulate effectively*, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

Listing 1.00(B)(2)(b).

The ALJ found both physical and mental severe impairments at Step Two: bipolar disorder, anxiety, arthritis, myalgia, cellulitis, and drug and/or alcohol addiction. Tr. 23. He then concluded, under the analysis for cases involving substance abuse, that, if Meech stopped his substance abuse, he would not have an impairment or combination of impairments that met or medically equaled one of the Listings. In reaching this conclusion, the ALJ devoted almost his

entire four-page assessment to Meech's mental impairments. Tr. 24-27.  The entirety of the ALJ's consideration of Meech's physical impairments is contained in a single, vague sentence: "The claimant's arthritis, myalgia, and cellulitis limits his exertional level of functioning."  Tr. 25.  The ALJ did not discussed which specific Listing(s) he considered with regard to these physical impairments, did not compare the requirements for the Listing(s) with the medical evidence of record, and did not explain the basis for his apparent conclusion that Meech's physical impairments did not meet or equal the Listing(s).

The ALJ's Step Three conclusion as to Meech's physical impairments does not satisfy the substantial evidence standard.  This case is analogous to *Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. Appx 411 (6th Cir. 2011), in which the Sixth Circuit held that the ALJ erred in "failing to analyze Reynolds' physical condition in relation to the Listed Impairments." *Id.* at 416.  In *Reynolds,* as in this case, the ALJ found, at Step Two, that the claimant had both physical and mental severe impairments.  He began his Step Three determination with a conclusory statement concerning the applicant's back impairment.  Although the ALJ followed that with a "thorough analysis" and a "full-page assessment of Reynolds' mental impairment," which the Sixth Circuit found to meet the substantial evidence standard (*id.* at 415), he did "[n]o analysis whatsoever as to whether Reynolds' physical impairments met or equaled a Listing despite his introduction concluding that they did not." *Id.*  The Sixth Circuit reversed and remanded for the ALJ "to revisit the case and explain his findings at Step 3." *Id.* at 413.

The *Reynolds* Court set forth the requirements for an ALJ's Step Three analysis as follows:

> In short, the ALJ needed to actually evaluate the evidence, compare it to Section 1.00 of the Listing, and give an explained conclusion, in order to facilitate meaningful judicial review.  Without it, it is impossible to say that the ALJ's decision at Step Three was supported by substantial evidence.

424 Fed. Appx. at 415.[3]  This Court recently applied and followed *Reynolds* in another case similar on its facts to the instant case.  *May v. Astrue,* No. 4:10CV1533, 2011 WL 3490186, *9 (N.D. Ohio June 1, 2011)*, adopted*, 2011 WL 3490229 (N.D. Ohio Aug. 10, 2011) (Adams, J.) (Remanding where ALJ, at Step Three, provided conclusion but no analysis as to claimant's physical impairment while providing satisfactory analysis as to claimant's mental impairment).

In this case, the ALJ offered no analysis at Step Three to support his conclusion that Meech's physical impairments did not meet a Listing Impairment.  In fact, the ALJ's error in the present case was more egregious than that of the ALJ in *Reynolds*.  Not only did the ALJ here fail to explain the basis for his determination that Meech's physical impairments did not meet or equal a Listing, he failed to indicate the specific Listing(s) he considered under Step Three.  Because the ALJ provided no analysis at Step Three, this Court cannot evaluate effectively whether or not the ALJ's decision is supported by substantial evidence.  Indeed, it is impossible to determine what Listing(s) the ALJ reviewed and/or what evidence the ALJ evaluated to reach his ultimate conclusion that Meech's physical impairments did not meet or equal a Listing.  Accordingly, remand is appropriate so that the ALJ can evaluate the evidence concerning Meech's physical impairments, compare that evidence to the Listings, and provide a reasoned explanation for his conclusion at Step Three.

Notwithstanding the foregoing, the Commissioner contends that any error the ALJ committed in his Step Three analysis is harmless because the medical evidence of record does not establish that Meech's physical impairments satisfied the criteria for any Listed Impairment.

---

[3] The Sixth Circuit indicated that these requirements follow from an ALJ's statutory duty, under 5 U.S.C. § 557(C)(3)(A), to "include a discussion of 'findings and conclusions, and the reasons or basis therefor, on all the material issues of fact, law, or discretion presented on the record.'" *Reynolds*, 424 Fed. Appx at 414 (quoting 5 U.S.C. § 557(C)(3)(A)).  This "reasons requirement is both a procedural and substantive requirement, necessary in order to facilitate effective and meaningful judicial review." *Id*.

The Commissioner refers to evidence in the record in support of his position.  Doc. 16, pp. 12-13.  Unfortunately, the ALJ included no such analysis and the Court cannot engage in *post hoc* rationalizations.  *S.E.C. v. Chenery,* 332 U.S. 194, 196 (1947) (a reviewing court must judge propriety of agency action "solely by the grounds invoked by the agency").  "[A]rguments [crafted by defense counsel] are of no consequence, as it is the opinion given by an administrative agency rather than counsel's '*post hoc* rationale' that is under the Court's consideration."  *See, e.g., May v. Astrue*, 2011 WL 3490186, *9; *Bable v. Astrue,* 2007 U.S. Dist. LEXIS 83635, 27–28 (N.D. Ohio Oct. 31, 2007) (citing *NLRB v. Ky. River Cmty. Care, Inc.,* 532 U.S. 706, 715, n. 1, 121 S.Ct. 1861 (2001)).

Moreover, the ALJ's failure to explain how he reached his conclusion that Meech's physical impairments do not meet or medically equal a Listing is not harmless error because, if a claimant is found to meet a Listed Impairment, the claimant is disabled within the meaning of the regulations and is entitled to benefits; no additional analysis is necessary. 20 C.F.R. § 404.1520(a)(4)(iii); *see also Reynolds,* 424 Fed. Appx. at 416 (holding that the ALJ's error in failing to evaluate evidence of the applicant's back impairment was not harmless).

Further, as in *Reynolds*, it cannot be said that the complete lack of explanation at Step Three is harmless error in this case.  Application of harmless error may be appropriate where the review of a decision as a whole leads to the conclusion that no reasonable fact finder, following the correct procedure, could have resolved the factual matter in another manner.  *See Hufstetler v. Comm'r of Soc. Sec.*, 2011 U.S. Dist. LEXIS 64298, *26-27 (N.D. Ohio June 17, 2011); *Malone v. Comm'r of Soc. Sec.*, 2011 U.S. Dist. LEXIS 130537, *4-6 (N.D. Ohio November 10, 2011).  For example, in *Hufstetler*, the Court found that the ALJ's lack of a full discussion at Step Three was harmless error because the ALJ's findings at Step Four provided sufficient

information for the Court to determine that no reasonable administrative fact finder would have resolved the matter differently.  *Hufstetler*, 2011 U.S. Dist. LEXIS at *26-27; *Malone*, 2011 U.S. Dist. LEXIS 130537 at *4-6 (finding that, based on a review of the ALJ's decision as a whole, remand was not necessary even though the ALJ's decision contained only a conclusory statement regarding Step Three).

Here, in contrast to *Hufstetler* and *Malone*, the ALJ's complete failure to explain how he reached his conclusion that Meech's physical impairments do not meet or medically equal a Listing is not harmless error.  As discussed by Meech, there is evidence in the record that could support a finding that he met or equaled Listing 1.02(A).  Doc. 14, pp. 14-15.  A brief summary of that evidence is as follows:

- Meech contracted MRSA in his right knee in June 2010 that caused debilitating pain (Tr. 349-53, 364-65, 387-91);

- On June 21, 2010, Meech underwent a right knee arthroscopy for an infection so severe that it also may have affected his ACL (Tr. 315-16);

- Meech was also treated with an IV antibiotics regimen and Coumadin (Tr. 315-16, 329, 331-32, 341, 364, 383-84, 387-91);

- Meech's recovery from the procedure was complicated by a septic pulmonary embolism and deep vein thrombosis in his lower extremities (Tr. 364-65);

- A physical therapy evaluation revealed moderate to severe deficiencies in Meech's balance, gait, strength, and range of motion that affected his ability to ambulate (Tr. 324-26);

- Meech was prescribed a cane and walker to assist with his rehabilitation (Tr. 337);

- Meech stayed at a nursing home after his surgery for 40 days, where he underwent rehabilitation and continued his antibiotic regime (Tr. 394-409);

- Meech was discharged from the nursing home on July 30, 2010 because he was able to ambulate independently with a walker (Tr. 409);

- In August 2010, Meech began treating with Dr. Pahr, a pain management specialist, for continuing pain in his right leg/knee (Tr. 485-86, 504-05);

- Meech experienced falling episodes because his knee "gives out" (Tr. 505);

- In November 2010, Meech's MRSA infection returned to his right knee.  He underwent a second surgery to clean out the infection and also a began a second round of antibiotic treatment (Tr. 509-10, 528-29, 532, 536-42);

- CT scans performed in December 2010 revealed deformities to Meech's tibia that were caused by his MRSA osteomyelitis (Tr. 606-07);

- Meech continued to experience balance and gait problems due to his chronic MRSA infections up until the hearing (Tr. 602-03, 631-32, 636-40, 651);

- Meech's testified that he underwent multiple knee surgeries and had multiple courses of IV antibiotics, including during his stay of about "40 days in a nursing home" (Tr. 47-48);

- Meech further testified that he uses a cane to ambulate in and outside the home and that he has experienced several falling episodes due to his knees giving out (Tr. 48-49); and

- Meech estimated that he could only ambulate "100 yards or so" due to pain (Tr. 49).

The foregoing examples demonstrate that, at the very least, the ALJ's Step Three analysis should have included more than a vague and bare conclusion with regard to Meech's physical impairments.  And, even though the ALJ did discuss Meech's physical impairments at Step Two and in his RFC analysis, it cannot be said, based on a review of the decision as a whole, that no reasonable fact finder, following the correct procedure, could have resolved the Step Three finding differently.[4]  Thus, the ALJ should have explained how he reached his conclusion that Meech's physical impairments did not met or equal a Listing.  His failure to do so was not harmless error.

In sum, the ALJ erred at Step Three by failing to analyze Meech's physical condition in relation to the Listed Impairments.  Without an evaluation of the evidence, comparison of that

---

[4]  In fact, in a subsequent administrative proceeding, a different ALJ found at Step Two that Meech had additional severe physical impairments relating to his right tibia and concluded at Step Five that Meech was disabled as of March 9, 2011, the day after the ALJ in this case issued his decision.  See Doc. 17, Exhibit 1, *Shawn Meech Subsequent Fully Favorable Decision dated 12/04/12.*  It therefore cannot be said that remand would be futile in this case.

evidence to the Listings, and an explained conclusion, meaningful judicial review cannot occur; "it is impossible to say that the ALJ's decision at Step Three was supported by substantial evidence." *Reynolds*, 424 Fed. Appx. at 416.  Therefore, it is recommended that this matter be remanded for a discussion of the evidence and an explanation of reasoning supporting the determination that Meech's physical impairments do not meet or medically equal a Listed Impairment.[5]

## C.  Other Issues

Because remand is appropriate, the undersigned will not address Meech's remaining arguments.  *See May*, 2011 WL 3490186, at *10 (declining to address plaintiff's remaining arguments since remand was already required because the ALJ failed to analyze the plaintiff's physical condition in relation to the Listed Impairments under Step Three); *Trent v. Astrue*, Case No. 1:09CV2680, 2011 U.S. Dist. LEXIS 23331, at *19 (declining to address the plaintiff's remaining assertion of error because remand was already required and, on remand, the ALJ's application of the treating physician rule might impact his findings under the sequential disability evaluation).

## VI.  Conclusion and Recommendation

For the foregoing reasons, the final decision of the Commissioner denying Plaintiff Shawn Michael Meech's application for SSI should be REVERSED and the case REMANDED for further proceedings consistent with this Report and Recommendation.

Dated: April 1, 2013

_____
Kathleen B. Burke
United States Magistrate Judge

---

[5] A full review and analysis after remand may not result in a disability finding at Step Three but, without a meaningful explanation, such a possibility cannot be ruled out definitively.

## **OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); s*ee also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).